UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

BARTHOLOMEW CRAWFORD,

                                Petitioner,

               -v.-

MICHAEL CAPRA, *Superintendent, Sing Sing Correctional Facility*,

                                Respondent.

20 Civ. 8574 (KPF) (SDA)

**OPINION AND ORDER
ADOPTING REPORT AND
RECOMMENDATION**

KATHERINE POLK FAILLA, District Judge:

Petitioner Bartholomew Crawford filed a petition for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254 (the "Petition") against Respondent Superintendent Michael Capra of the Sing Sing Correctional Facility in Ossining, New York.  Crawford's Petition seeks review of his New York State Supreme Court conviction for second-degree burglary, a charge for which he was convicted following a second jury trial, after the first trial ended in a hung jury.

Now pending before the Court is the June 14, 2021 Report and Recommendation from United States Magistrate Judge Stewart D. Aaron (the "Report," copy attached), which recommends that the Petition be dismissed in its entirety.  The Court has examined the Report, Petitioner's July 12, 2021 objections to the report (the "Objections"), Respondent's August 17, 2021 submission in response to the Objections, as well as the parties' submissions before Judge Aaron and the underlying state court record.  For the reasons set forth below, the Court finds no error in the Report and adopts it in its entirety.

**BACKGROUND**[1]

The facts and procedural history underlying this action are set forth in the Report (*see* Report 2-9), and the Court assumes familiarity with them. A brief overview is set forth herein.

## A.     Factual Background

On November 6, 2015, a jury convicted Petitioner of burglary in the second degree; Petitioner was later sentenced as a persistent violent felony offender to an indeterminate prison term of 25 years to life. (Report 1; Petition ¶¶ 2-3). The incident giving rise to Petitioner's conviction was the burglary of Wendy Shanker's top-floor Chelsea apartment, which occurred in the early morning hours of October 27, 2009. (Report 2). The intruder allegedly pried open a loft window of the apartment that was accessible from the roof and proceeded to bind Ms. Shanker's wrists with a nylon stocking and blindfold her with a sleep mask. (*Id.* at 3-4; Petition ¶ 13). The burglar stole $5,000 in cash and $60,000 in jewelry from Ms. Shanker's apartment. (Report 4).

Between October 30, 2009, and November 16, 2009, DNA tests were performed on several pieces of evidence recovered from Ms. Shanker's apartment, including the nylon stocking that had been used to tie Ms. Shanker's hands and the window frame that had been pried open. (Report 6). The tests revealed DNA matching Petitioner's profile on the nylon stocking, and

---

[1]     This Opinion draws its facts largely from the Petition (Dkt. #1), the Report (Dkt. #22), Petitioner's memorandum of law in support of the Petition ("Pet. Br." (Dkt. #2)), and the state court record ("SR" (Dkt. #13-2, 13-3)).

DNA of a different man on the inside window frame.  (*Id.*).  Following the results

of the DNA tests, Petitioner was arrested on December 9, 2009.  (*Id.*).

**B.      The State Court Proceedings**

   **1.      Petitioner's Trials, Conviction, and Sentence**

On December 19, 2009, a grand jury sitting in Manhattan indicted

Petitioner, charging him with the offense of burglary in the first degree.

(Report 7; SR 72, 233).  Nearly three years later, on October 11, 2012,

Petitioner proceed to trial before a jury in New York State Supreme Court.

(Report 7).  Seven days later, on October 18, 2012, the presiding judge declared

a mistrial because the jury was deadlocked.  (*Id.*).

Thereafter, Petitioner was re-tried, and that second trial commenced on

June 13, 2013.  (Report 7).  The evidence at trial included the DNA evidence

linking Petitioner to the nylon stocking, as well as the test results showing that

another man's DNA sample had been found on the broken-in window frame.

(*Id.* at 6).  Ms. Shanker also testified that based off her physical struggle with

the intruder, she believed he weighed between 180 to 200 pounds and stood

between 5'9" and 5'11" inches tall — despite Petitioner's standing at only 5'3"

tall.  (*Id.* at 3, 6).  She also noticed that the intruder had rifled through her

lingerie drawers, and believed that the stocking used by the burglar belonged

to her.  (*Id.* at 4).  On cross-examination, however, Ms. Shanker admitted that

she could not be certain where the stocking came from because she did not see

the intruder take it from her dresser.  (*Id.*).

The presiding judge charged the jurors on first-degree burglary, and instructed them that if they found Petitioner not guilty of this offense, they could consider the lesser included offense of second-degree burglary.  (Report 7).  During deliberations, the jury announced they were deadlocked, in response to which the court gave the jury an *Allen* charge.  (*Id.*).  After further deliberations, the jury returned a verdict convicting Petitioner of second-degree burglary, but acquitting him of first-degree burglary.  (*Id.*).  Following this verdict, on November 6, 2015, Petitioner was sentenced to a term of imprisonment of 25 years to life.  (*Id.* at 8).  During Petitioner's sentencing hearing, it was made clear that this conviction was Petitioner's fourth violent felony conviction and the sixth time he was convicted of a burglary-related offense.  (Dkt. #1-12 at 4-5).

### 2. Petitioner's Direct Appeal to the Appellate Division

In January 2019, Petitioner filed a direct appeal of his conviction to the Supreme Court of the State of New York, Appellate Division, First Department. (Report 8; SR 500-33).  In his appeal, Petitioner argued in relevant part that: (i) the jury's verdict was not supported by legally sufficient evidence, and was against the weight of the evidence, because the prosecution had failed to prove that he was the individual who burglarized Ms. Shanker's apartment; and (ii) his sentence was excessive.  (Report 8).  On June 11, 2019, the Appellate Division unanimously affirmed Petitioner's conviction.  *See People* v. *Crawford*, 99 N.Y.S.3d 878 (1st Dep't 2019).

In finding the evidence at trial sufficient to convict Petitioner, the Appellate Division emphasized that it was "undisputed that [Petitioner's] DNA was on the stockings used by the burglar to tie up his victim, and that the only DNA found on the stockings came from [Petitioner] and the victim." *Crawford*, 99 N.Y.S.3d at 878. The Appellate Division discredited Petitioner's explanation for how his DNA was found at the crime scene (*i.e.*, that he had previously come in contact with the stockings and that another person used those particular stockings to commit the burglary) because it "rests entirely on speculation." *Id.* at 878-79. The Appellate Division also noted that the evidence supported the inference that the burglar took the stockings from Ms. Shanker's hosiery drawer, despite her inability to identify the garment as her own. *Id.* at 879. The Appellate Division further saw no basis for a sentence reduction. *Id.*

### 3. Petitioner's Denial of Leave to Appeal to the Court of Appeals

Following the Appellate Division's denial of his appeal, Petitioner sought leave to appeal this decision to the New York Court of Appeals. (Report 9; SR 598-629). On July 31, 2019, the New York Court of Appeals denied Petitioner's application. *People* v. *Crawford*, 33 N.Y.3d 1103 (2019).

### C. The *Habeas Corpus* Petition

On October 14, 2020, Petitioner filed a petition in this Court for a writ of *habeas corpus*, on the grounds that the state court's adjudication of his claim had resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, or, alternatively, was based on

an unreasonable determination of the facts in light of the evidence presented. (Petition ¶ 11).  Petitioner asserted two primary arguments controverting the state court determination: (i) DNA evidence recovered from an easily movable object such as a stocking is insufficient on its own to prove guilt, unless the prosecution also established that the DNA was deposited during the commission of the crime (*id.* at ¶ 19); and (ii) the evidence was insufficient to support Petitioner's conviction because the jury had no rational basis to conclude that Petitioner was any more likely to have committed the burglary than the man whose DNA was recovered from the broken-in window frame (*id.* at ¶ 21).

The day after Petitioner filed the Petition, the Court referred the case to Judge Aaron for a Report and Recommendation.  (Dkt. #6).

**D.    The Report and Recommendation**

Judge Aaron issued the Report on June 14, 2021.  In recommending that the Petition be denied, Judge Aaron rejected Petitioner's attempts to locate an error of clearly established federal law in the state court's adjudication of his criminal case.  Specifically, Judge Aaron found that it was not an unreasonable application of federal law for the Appellate Division to conclude that the DNA evidence linking Petitioner to the nylon stocking was legally sufficient to support his conviction.  (Report 12-14).

In his briefing to Judge Aaron, Petitioner had cited cases from the Fourth, Sixth, Ninth, and District of Columbia Circuits, as well as from the District of Maryland and the New York state court system, in support of the

legal principle that "[u]nder federal law, where the prosecution seeks to prove a defendant's guilt *solely* on the presence of his forensic material on an easily movable object, the prosecution must establish that the forensic material could have been left only during the commission of the crime." (*Id.* at 12 (quoting Pet. Br. 13)).  However, Judge Aaron declined to rely on these cases, noting that a state prisoner may not seek federal habeas relief on the basis of a state court's refusal to adhere to legal principles articulated only by lower federal courts, as opposed to the Supreme Court.  (*Id.* at 13).  Moreover, Judge Aaron noted that only one of the cases cited by Petitioner in support of this legal principle had arisen in the habeas context.  (*Id.* at 13 n.13).[2]  As such, Judge Aaron concluded that Petitioner had not shown that the Appellate Division's decision upholding the sufficiency of the DNA evidence found on the nylon stocking flouted clearly established federal law.  (*Id.* at 13).

Judge Aaron also addressed Petitioner's argument that the Appellate Division had unreasonably applied the Supreme Court's decision in *Jackson* v. *Virginia*, 443 U.S. 307 (1979), which established the federal due process principles bearing on the sufficiency of evidence underpinning a conviction. (Report 10, 13-14).  In reviewing the Appellate Division's affirmance of Petitioner's conviction, Judge Aaron observed that the court's decision relied upon two aspects of the record evidence: (i) the fact that Petitioner's DNA was

---

[2]     The only habeas case cited by Petitioner on this point was *Mikes* v. *Borg*, 947 F.2d 353 (9th Cir. 1991), which Judge Aaron did not find persuasive because it pre-dated the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), discussed further herein.  (Report 13 n.13).

found on the stocking used to tie up Ms. Shanker; and (ii) the evidence suggesting that the burglar took the stocking from Ms. Shanker's drawer, notwithstanding her inability to identify the particular stocking as her own. (*Id.* at 14).   The Appellate Division also cited to cases finding that fingerprint evidence, on its own, could establish a defendant's guilt beyond a reasonable doubt despite speculation as to the origin of the prints.   (*Id.* (citing *Taylor* v. *Stainer*, 31 F.3d 907, 909-10 (9th Cir. 1994)).   Acknowledging that the jury in Petitioner's second trial had struggled to weigh the evidence, Judge Aaron remarked that "it is not the function of this Court to second-guess the second jury's verdict reached after due deliberation," and further concluded that it "cannot be said that the Appellate Division's decision was objectively unreasonable such that no rational trier of fact could have found proof of guilt beyond a reasonable doubt."   (*Id.* at 14 & n.15).

Finally, Judge Aaron rejected Petitioner's remaining challenge to the sufficiency of evidence.   (Report 15).   In asserting this challenge, Petitioner argued that the Appellate Division had misapplied *Jackson* because "no rational juror could have found beyond a reasonable doubt that it was [Petitioner], rather than the unknown Male Donor B [whose DNA was found on the window frame], who was present in the apartment to commit the alleged crime."   (*Id.* (quoting Pet. Br. 18)).   Judge Aaron reasoned that "the prosecution need not disprove every possible hypothesis of innocence," and that it was "for the jury to decide what conclusions should be drawn from the evidence admitted at trial."   (*Id.* (internal quotation marks and citations omitted)).   In

8

light of the previously-discussed DNA evidence, Judge Aaron determined that it was not objectively unreasonable for the Appellate Division to find that the jury's verdict was rational. (*Id.*).

## E.     Petitioner's Objections to the Report

Petitioner filed the Objections on July 12, 2021. To begin, Petitioner argues that the Report incorporated legal error because it applied a legal standard in conflict with established federal due process principles and ignored Petitioner's citations to lower court precedent articulating the proper standard. (Objections 3). Petitioner contends that a proper application of *Jackson* and the lower court cases "illuminating those principles to these facts" reveals that no rational juror could have found Petitioner guilty beyond a reasonable doubt, especially in light of the exculpatory evidence of another man's DNA on the window frame. (*Id.*).

More specifically, Petitioner argues that Judge Aaron applied an unreasonably high legal standard, which demands that the Supreme Court have addressed an "identical factual pattern" for a petition to merit habeas relief. (Objections 3-4). Petitioner offers the same cases cited in his opening brief in support of the Petition to assert that it is an unassailable tenet of federal law that, "when relying solely on the presence of a defendant's forensic material on a readily moveable object, the government must establish that the forensic material could have been left only during the commission of the crime." (*Id.* at 4-5). Because the prosecution failed to make such a showing at

trial, Petitioner contends that no reasonable jury could have convicted him on the evidence presented. (*Id.*).

Petitioner additionally mounts the related objection that Judge Aaron erred in concluding that it was not objectively unreasonable for the jury and the Appellate Division to infer that Petitioner's DNA was left on the stocking during the commission of the burglary. (Objections 5). Petitioner argues that in order to convict Petitioner, the jury had to infer that his DNA was left on the stocking during the burglary, despite "powerful exculpatory evidence" suggesting otherwise. (*Id.*). On Petitioner's view, it was objectively unreasonable for the jury to infer that his DNA was placed on the stocking during the commission of the crime, while at the same time presuming that the forensic evidence not belonging to Petitioner was deposited at the scene at some different time. (*Id.* at 5-6). Petitioner objects that the Report perpetuates this erroneous inference. (*Id.* at 6).

## DISCUSSION

### A.   Applicable Law

#### 1.   Reviewing the Report and Recommendation of a Magistrate Judge

A court may accept, reject, or modify, in whole or in part, the findings or recommendations made by a magistrate judge. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Grassia* v. *Scully*, 892 F.2d 16, 19 (2d Cir. 1989). A court may also accept those portions of a report to which no specific, written objection is made, as long as the factual and legal bases supporting the findings are not clearly erroneous. *See Ramirez* v. *United States*, 898 F. Supp. 2d 659, 663

(S.D.N.Y. 2012) (citation omitted).  A magistrate judge's decision is clearly erroneous only if the district court is "left with the definite and firm conviction that a mistake has been committed."  *Easley* v. *Cromartie*, 532 U.S. 234, 242 (2001) (quoting *United States* v. *U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

Where a party submits timely objections to a report and recommendation, as Petitioner has done here, the Court is obligated to review the contested issues *de novo*.  *See* Fed. R. Civ. P. 72(b)(3); *Hynes* v. *Squillace*, 143 F.3d 653, 656 (2d Cir. 1998).  However, where objections are "conclusory or general," or where a petitioner "simply reiterates his original arguments," the report should be reviewed only for clear error.  *Walker* v. *Vaughan*, 216 F. Supp. 2d 290, 292 (S.D.N.Y. 2002) (internal quotation marks and citation omitted); *see also Phillips* v. *Reed Grp., Ltd.*, 955 F. Supp. 2d 201, 211 (S.D.N.Y. 2013) ("Objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original papers will not suffice to invoke *de novo* review." (internal quotation marks, citation, and alteration omitted)).  Finally, "it is sufficient that the court arrive at its own independent conclusion regarding those portions of the report to which objections are made"; the court "need not conduct a *de novo* hearing on the matter."  *In re Hulley Enters. Ltd.*, 400 F. Supp. 3d 62, 69 (S.D.N.Y. 2019) (quoting *Nelson* v. *Smith*, 618 F. Supp. 1186, 1189-90 (S.D.N.Y. 1985)).

2. **Reviewing State Court Decisions Under the Antiterrorism and Effective Death Penalty Act ("AEDPA")**

Under AEDPA, a federal court cannot grant a petition for a writ of *habeas corpus* based on a claim that was "adjudicated on the merits in State court proceedings" unless the state court's decision: (i) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (ii) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).  This is a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt."  *Cullen* v. *Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford* v. *Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  *Harrington* v. *Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough* v. *Alvarado*, 541 U.S. 652, 664 (2004)).

Federal law is "clearly established" when it is expressed in "the holdings, as opposed to the dicta, of [the Supreme Court's] decisions."  *Howes* v. *Fields*, 565 U.S. 499, 505 (2012) (internal quotation marks omitted).  A state court's decision is "contrary" to clearly established federal law when the state court "applies a rule that contradicts the governing law set forth in" a Supreme Court opinion or "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a ... different [result]."  *Williams* v. *Taylor*, 529 U.S. 362, 405-06 (2000).  And a state court's

decision can only be considered "unreasonable" if "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents."  *Harrington*, 562 U.S. at 102; *see also Woods* v. *Donald*, 575 U.S. 312, 316 (2015) (per curiam) (explaining that AEDPA only allows federal habeas courts to overturn state court decisions "when there could be no reasonable dispute that they were wrong"); *Vega* v. *Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (same).

When a federal court reviews a state court's factual determinations, those decisions "shall be presumed to be correct," and that presumption can only be rebutted by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *see also McKinney* v. *Artuz*, 326 F.3d 87, 101 (2d Cir. 2003).

**B.     Analysis**

Both of Petitioner's objections to the Report — that Judge Aaron impermissibly (i) declined to rely on lower federal court decisions bearing on federal evidence law concerning movable forensic evidence (*compare* Objections 4-5, *with* Pet. Br. 13-17); and (ii) agreed with the Appellate Division that a rational jury could have convicted Petitioner on the evidence presented at trial (*compare* Objections 5-7, *with* Pet. Br. 17-20) — were presented in his briefing in support of the Petition.  Accordingly, this Court reviews these objections to the Report for clear error.  *See Walker*, 216 F. Supp. 2d at 292. As described below, the Court finds none.

13

### 1.   The Report Did Not Err in Declining to Rely on Petitioner's Proffered Lower Federal Court Decisions

Judge Aaron articulated and applied the correct legal standard on federal habeas review under AEDPA, which statute provides that a state prisoner is entitled to habeas relief where one can establish that a state court's denial of a federal claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court." (Report 9 (quoting U.S.C. § 2254(d)(1)).  Judge Aaron cited the Supreme Court's decision in *Glebe* v. *Frost*, 574 U.S. 21, 24 (2014), for the well-established precept that lower federal court precedent does not constitute "clearly established Federal law" for AEDPA purposes.  (*Id.* at 13).  *See also, e.g., Marshall* v. *Rogers*, 569 U.S. 58, 64 (2013) (per curiam) ("Although an appellate panel may, in accordance with its usual law-of-the-circuit procedures, look to circuit precedent to ascertain whether it has already held that the particular point in issue is clearly established by Supreme Court precedent …, it may not canvass circuit decisions to determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to this Court, be accepted as correct."); *Parker* v. *Matthews*, 567 U.S. 37, 48 (2012) (per curiam) ("[C]ircuit precedent does not constitute "clearly established Federal law, as determined by the Supreme Court").  Further, the Supreme Court has said that "Circuit precedent cannot 'refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that this Court has not announced."  *Lopez* v. *Smith*, 574 U.S. 1, 7 (2014) (citing *Marshall*, 569 U.S. at 64).

After careful review of Judge Aaron's analysis in the Report, the Court finds there to be no error — let alone clear error — in his recommendation to reject Petitioner's argument that the Appellate Division violated clearly established federal law in upholding Petitioner's conviction.  (Report 12-14). Rather than demanding the existence of a Supreme Court case with facts identical to those in this case, the Report faithfully adheres to the Supreme Court precedent interpreting AEDPA.  Given that Petitioner's proffered principle of federal movable forensic evidence law has never been articulated by the Supreme Court, Judge Aaron did not err in refusing to rely on cases supporting that principle to find that the Appellate Division committed its own legal error.

### 2.   The Report Properly Rejected Petitioner's Argument That His Conviction Was Premised on an Impermissible Inference

Nor did Judge Aaron err in rejecting Petitioner's argument that the evidence was insufficient to support his conviction.  Judge Aaron correctly noted that under *Jackson* v. *Virginia*, the relevant inquiry for a court reviewing the sufficiency of evidence underpinning a criminal conviction is whether, viewing the evidence in the light most favorable to the prosecution, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  (Report 10 (quoting *Jackson*, 443 U.S. at 319); *see also id.* at 13-14).  And because the state court had already rejected Petitioner's claim of insufficient evidence on the merits, Judge Aaron properly applied a "doubly deferential standard of review."  (*Id.* at 11 (quoting *Fashaw* v. *Griffin*, No. 17 Civ. 7328 (KPF), 2020 WL 6482924, at *3 (S.D.N.Y. Nov. 4, 2020)).  Judge Aaron explained that in such a case, when the state court has

15

already spoken, the writ should not be granted unless "*no* reasonable court could have held that *any* reasonable jury could have read the evidence to establish petitioner's guilt beyond a reasonable doubt." (*Id.* (quoting *Garbutt* v. *Conway*, 668 F.3d 79, 81-82 (2d Cir. 2012))).

The Court has carefully assessed Judge Aaron's analysis bearing on the Appellate Division's determination of the sufficiency of evidence and finds no legal error. Indeed, the Report demonstrates the proper degree of deference to the jury's assessment of the evidence that was presented at trial. (Report 13-15). The Court agrees with Judge Aaron that there existed record evidence tying Petitioner to the burglary such that "it simply cannot be said that the Appellate Division's decision was objectively unreasonable such that no rational trier of fact could have found proof of guilt beyond a reasonable doubt." (*Id.* at 14 & n.15).[3]

---

[3]     Petitioner does not object to Judge Aaron's recommendation that to the extent Petitioner seeks relief on the grounds that his conviction was against the weight of the evidence, this claim should be denied because it is not cognizable on federal habeas review. (Report 11 n.11). As the Court believes Judge Aaron's reasoning to be sound, it adopts this recommendation and denies Petitioner's weight-of-the-evidence claim.

**CONCLUSION**

For the foregoing reasons, the Court adopts Judge Aaron's well-reasoned Report in full.  Accordingly, it is hereby ordered that the Petition is DENIED. The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:     April 5, 2022
           New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
USDC SDNY
DOCUMENT
ELECTRONICALLY  FILED
DOC #:_____
DATE FILED:___6/14/2021___
```

**Bartholomew Crawford,**

                                    **Petitioner,**

             **-against-**

**Michael Capra, Superintendent, Sing Sing**
**Correctional Facility,**

                                    **Respondent.**

**1:20-cv-08574 (KPF) (SDA)**

<u>**REPORT AND RECOMMENDATION**</u>

**STEWART D. AARON, UNITED STATES MAGISTRATE JUDGE.**

**TO THE HONORABLE KATHERINE POLK FAILLA, UNITED STATES DISTRICT JUDGE:**

<u>**INTRODUCTION**</u>

*Pro se* Petitioner Bartholomew Crawford ("Crawford" or "Petitioner"), currently incarcerated at Sing Sing Correctional Facility in New York State, seeks a writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254. (Pet., ECF No. 1, at 1; *id.* ¶ 4.) On November 6, 2015, following a jury trial, a judgment was rendered in the Supreme Court of the State of New York, New York County, convicting Petitioner of Second Degree Burglary and sentencing him as a persistent violent felony offender to an indeterminate prison term of twenty-five years to life. (Pet. ¶¶ 1-3, 5; Answer, ECF No. 13, ¶ 1.)

Petitioner challenges his conviction on the ground that the DNA evidence against him was legally insufficient to prove his guilt beyond a reasonable doubt. (Pet. ¶¶ 19-22.) For the reasons set forth below, I respectfully recommend that the Petition be DENIED.

**BACKGROUND**

I.      **Facts Giving Rise To Crawford's Conviction**[1]

    A.  **The Burglary**

The incident that gave rise to Crawford's conviction occurred early in the morning on October 27, 2009. On that date, the second-floor apartment of the victim, Wendy Shanker ("Shanker"), at 349 West 19th Street in Manhattan, was burglarized. (Tr. 65, 69-78 (Shanker).) Her apartment was in a two-story building, originally a single-family home, that had been divided into apartments on each floor. (*Id*. 65.) Shanker's apartment had a main floor with a spiral staircase to a loft, as well as roof access. (*Id*.)

On the evening of October 26, 2009, after eating dinner out with friends, Shanker returned home around 9:30 or 10:00 p.m. and locked her doors and windows. (Tr. 66-68 (Shanker).) Before going to bed at around 1:40 a.m., she removed her hearing aids.[2] (*Id*. 68-69, 73-74, 104.)

At around 2:36 a.m., Shanker awoke because she felt a man on top of her. (Tr. 69, 104 (Shanker).) Afraid that the man was going to rape or kill her, she tried to fight and get him off her. (*Id*. 69-70, 105-08.) Based on the "intensity of the fight in the bed," she estimated that the

---

[1] The following facts are derived from trial testimony. The trial transcript is contained at PDF pages 199 through 578 of ECF No. 13-4. Citations to pages of the trial transcript are made using the prefix "Tr." followed by the page number of the transcript itself (*e.g.*, "Tr. 1"). After page 190 of the trial transcript, the page numbering starts over at page 168. Thus, there are two sets of pages numbered 168 through 190. The Court uses "[1]" and "[2]" to denote each affected page number, with "[1]" referring to the first time the page number is used in the trial transcript, and "[2]" referring to the second time the page number is used in the transcript. Where citation is being made to witness testimony, the name of the witness is identified in parentheses following the page number.

[2] Shanker suffered from Wegener's granulomatosis, a chronic inflammatory disease that caused her to suffer "pretty severe hearing loss." (Tr. 64 (Shanker).) As a result, her hearing was "pretty dismal" unless she was wearing hearing aids. (*Id*.)

intruder weighed 180 to 200 pounds. (*Id*. 100-01.) Shanker testified that she "felt like [she] had Godzilla on [her]." (*Id*. 101.)

After turning on the lamp, the intruder bound Shanker's wrists behind her back with a nylon stocking and covered her eyes with a sleep mask. (Tr. 72-73, 82-83 (Shanker).) Although she was lying face down on the floor, she was able to shift the sleep mask and saw that the intruder was wearing a large hooded jacket with the hood up so she could not see his face, and that he was wearing white sneakers and jeans. (*See id.* 72-74, 78, 112.) In addition, when he walked by and she got a look at him, she estimated that he was "5-9 to 5-11."[4] (*See id.* 78, 100, 112.)

The intruder asked Shanker where she kept her jewelry and money and where he could find a bag. (Tr. 74-75, 116-17 (Shanker).) She told him that there was an unlocked safe in the

Although the intruder was talking, Shanker could not hear what he was saying since she was not wearing her hearing aids. (Tr. 69 (Shanker).) When she started to scream, the intruder placed his hands around her neck and choked her. (*Id*.) As the struggle continued, Shanker got tangled up in her bedding, and the two of them fell off the bed. (*Id*. 70, 106-07.)

The intruder covered Shanker's head with a comforter and then peeled it back to ask her where the light was located. (Tr. 71-73 (Shanker).) She explained that she was deaf, so the intruder bent down and spoke directly into her better ear.[3] (*Id*.) Shanker then told him where the lamp was located and how to turn it on. (*Id*.)

---

[3] Shanker told the police that, when he spoke, the intruder "sounded like a white guy from [New] Jersey." (Tr. 81 (Shanker).)

[4] Shanker's estimate of the intruder's height also was based upon the intruder laying on top of her in the bed. (*See* Tr. 100 (Shanker) ("I'm 5-7 and I figured he had to be bigger than me . . . .").)

3

hallway closet and that there were duffle bags in a living room cabinet. (*Id*. 74-75, 93.) The man went in and out of Shanker's bedroom numerous times; she assumed that he was taking items out of her safe and bedroom and putting them into a bag. (*Id*. 74-76, 117.)

Eventually, the intruder picked Shanker up off her bedroom floor, bent her over the bed, loosened the stockings that were restricting her hands and tied up her body using a pair of Spanx.[5] (Tr. 77-78, 82-83, 85, 121 (Shanker).) Shortly thereafter, the man tapped Shanker on the shoulder, told her not to call the police and left the apartment. (*Id*. 76-78, 118, 120.) He left, taking $5,000 in cash and $60,000 in jewelry. (*Id*. 118.) Shanker got her arms free, removed the mask from her eyes and called the police. (*Id*. 78-79, 82.)

When Shanker went to call the police, she saw that black knee-high pantyhose had been used to bind her wrists and that size D Spanx had been used for her "whole body." (Tr. 82-83 (Shanker).) She owned many pair of black knee-high pantyhose and size D Spanx[6] and, when she went into her bedroom, she saw that her lingerie drawers had been rifled through. (*Id*. 83.) Shanker thus concluded that both the knee high stocking and the Spanx that were used by the intruder "came from" her lingerie drawers. (*Id*.) On cross-examination, Shanker admitted that she did not "know for certain where [the] stocking came from" since she did not see the intruder take it from her dresser and the stocking was a generic one and had no markings on it. (*Id*. 114-16.)

---

[5] Spanx (misspelled in the trial transcript as "Spanks") is a brand name for a control top panty hose. (*See* Tr. 83 (Shanker).)

[6] Shanker only wore black hosiery and wore a size D Spanx at the time of the incident and at the time of the trial. (Tr. 83 (Shanker).)

### B. The Police Investigation

At around 3:00 a.m., very shortly after Shanker called the police, Police Officers James Ricker and Patrick Mooney arrived at her apartment. (Tr. 23-24 (P.O. Ricker); 128-29 (P.O. Mooney).) The officers observed that the window to Shanker's roof-level loft was pried open and still ajar and that the hatch on a neighboring roof also was ajar. (*Id*. 28-29 (P.O. Ricker); 131 (P.O. Mooney).) A wooden stepladder that was positioned beneath the hatch led into an abandoned brownstone. (*Id*. 30-31 (P.O. Ricker); 131 (P.O. Mooney).)

Assuming that the intruder had exited the apartment via the roof, Officers Ricker and Mooney, joined by two other officers, went onto the roof to look for him. (Tr. 28-29, 46 (P.O. Ricker); 131-33 (P.O. Mooney).) Officers Ricker and Mooney searched the roofs of the buildings to the east, while the other officers searched the roofs to the west. (*Id*. 29 (P.O. Ricker).) The search by Officers Ricker and Mooney did not bear fruit and they returned to Shanker's apartment while the other officers' search continued. (*Id*. 29-34, 50 (P.O. Ricker); 131-32 (P.O. Mooney).) The other officers later indicated that they had found Shanker's computer bag on the roof of the building directly next to Shanker's building. (*See id*. 33, 42 (P.O. Ricker).) Officer Ricker found Shanker's bedding on the ground behind that building. (*Id*. 33-34, 45.)

Shortly before 5:00 a.m., Police Officer Marlon Castro, who was part of an evidence collection team, arrived at Shanker's apartment. (Tr. 136 (P.O. Castro).) Officer Castro recovered, among other things, the stocking and Spanx used by the intruder to tie up Shanker; Shanker's computer bag; and DNA swabs from a window frame on the second floor of the apartment. (*Id*. 137-43, 145-49, 151-52, 162.) However, he did not swab the hatch, the ladder or any other location in the abandoned brownstone for DNA. (*Id*. 157-59.)

Between October 30 and November 16, 2009, Connie Laycock, a Criminalist at the New York City Office of the Chief Medical Examiner, performed DNA testing on several pieces of evidence recovered from Shanker's apartment. (Tr. 171[1], 175-83[1], 172-74[2] (Laycock).) The nylon stocking contained DNA from Shanker and Male Donor A; the stocking had been tied in a knot and Male Donor A's DNA was found both on the loop and on the strip. (*Id*. 180-82[1], 177-78[2].) Male Donor A's profile was consistent with a known sample of Crawford's DNA, which was stored in a state databank. (*See id*. 168–170[2] (Laycock); 230-31, 254-55 (Det. Erbis).) That DNA profile most likely "would be expected to be found in approximately one [in] greater than one trillion people." (Tr. 188[1] (Laycock).)

The DNA testing on the Spanx and computer bag found DNA from Shanker and an unidentified minor contributor. (*See* Tr. 185-87[1] (Laycock).) The DNA from the inside window frame was attributed to Male Donor B, who could not be identified. (*Id*. 187[1], 179[2].)

**C.   Crawford's Arrest**

On December 9, 2009, based upon the DNA evidence, Detective Geraldo Rivera and Detective Brian Erbis arrested Crawford in the hallway at 120 Suffolk Street in Manhattan, where he rented a make-shift bedroom in an apartment owned by Zola Pena. (Tr. 193-95, 201-08 (Det. Rivera); 231-34, 244-45, 255-57, 266-67 (Det. Erbis); 212-14, 218-19 (Pena).) Crawford is a black man who is 5 feet 3 inches tall and, at the time of his arrest, was wearing a black nylon stocking on his head. (*Id*. 251, 256 (Det. Erbis); 6/3/21 Oral Arg. Tr., ECF No. 21, at 5.) On December 11, 2009, after members of Crawford's family had visited Pena's apartment and collected some of his possessions, Detective Rivera and Detective Erbis executed a search warrant at the

apartment. but no evidence was found linking Crawford to the burglary. (*See id*. 195-200, 208-09

(Det. Rivera); 236-37, 265 (Det. Erbis); 214-16 (Pena).)

**II.**     **Relevant State Court Proceedings**

On or about December 19, 2009, a New York County Grand Jury charged Crawford with

Burglary in the First Degree (Penal Law § 140.30(2)). (SR 072, 233.)[7] On October 11, 2012,

Crawford proceeded to a jury trial before Justice Ruth Pickholz. (*Id*. 542.) On October 18, 2012,

Justice Pickholz declared a mistrial because the jury was deadlocked. (*See* 10/18/12 Hr'g Tr., ECF

No. 13-4, at PDF pp. 45-47.)

**A.**     **2013 Trial**

Commencing on June 13, 2013, Crawford was re-tried by jury before Justice Daniel

FitzGerald. A summary of the trial testimony offered by the prosecution is set forth in Background

Section I, *supra*. The defense presented no evidence at trial. (*See* Tr. 270.)

Justice FitzGerald charged the jury on Burglary in the First Degree, and instructed them

that, if they found Crawford not guilty of Burglary in the First Degree, they could consider the

lesser included offense of Burglary in the Second Degree. (Tr. 315-23.)

During deliberations, the jury announced it was deadlocked. (*See* Tr. 346.) In response,

the court gave an *Allen* charge.[8] (*Id*. 346-49.) After further deliberations, the jury returned a split

verdict convicting Crawford of Burglary in the Second Degree and acquitting him of Burglary in

the First Degree. (*Id*. 350.)

---

[7] The State Record is contained at ECF Nos. 13-2 and 13-3. Citations to pages of the State Record are made
using the prefix "SR" followed by the page number.

[8] *See Allen v. United States*, 164 U.S. 492 (1896) (approving use of supplemental instructions given to
deadlocked jury urging jurors in the minority to reconsider their position).

**B.**     **Sentencing**[9]

On November 6, 2015, Crawford was sentenced as a persistent violent felon[10] to twenty-

five years to life. (S. Tr. 9.)

**C.**     **Direct Appeal**

In January 2019, Crawford, through assigned counsel, Office of the Appellate Defender,

filed a direct appeal to the Supreme Court of the State of New York, Appellate Division, First

Department. (SR 500-33.) Crawford raised the following claims: (1) the jury's verdict was not

supported by legally sufficient evidence, and was against the weight of the evidence, because the

prosecution failed to prove his identity as the person who burglarized Shanker's apartment; and

(2) his sentence was excessive. (*See id*.)

On May 28, 2019, the Appellate Division unanimously affirmed Crawford's conviction.

*People v. Crawford*, 173 A.D.3d 484 (1st Dep't 2019). With respect to the first ground for appeal,

the Appellate Division held:

> The verdict was based on legally sufficient evidence and was not against the
> weight of the evidence. It is undisputed that defendant's DNA was on the stockings
> used by the burglar to tie up his victim, and that the only DNA found on the
> stockings came from defendant and the victim. There is no rational innocent
> explanation for the presence of defendant's DNA. Defendant's farfetched theory
> that he might have had contact with these stockings on some past occasion, and
> that another person somehow acquired them and brought them with him when
> he committed the burglary, rests entirely on speculation. Moreover, the evidence
> supported the inference that the burglar took the stockings from the victim's
> drawer, even though the victim could not actually "identify" the particular
> stockings.

---

[9] The sentencing transcript ("S. Tr.") is filed at ECF No. 13-4 at PDF pages 579 to 588.

[10] The underlying state conviction in this case was Crawford's fourth violent felony conviction and the sixth
time he was convicted of a burglary-related offense. (*See* S. Tr. 4-5.)

*Id*. at 484 (citations omitted). With respect to the second ground for appeal, the Appellate Division held that it "perceive[d] no basis for reducing the sentence." *Id*.

### D.   Denial Of Leave To Appeal To The Court Of Appeals

Petitioner filed a counseled leave application with the Court of Appeals of the State of New York, asking the court to review the issues raised in his Appellate Division brief. (SR 598-629.) On June 11, 2019, Chief Judge Janet DiFiore of the New York Court of Appeals denied Crawford's application for leave to appeal. *People v. Crawford*, 33 N.Y.3d 1103 (2019).

## III.   Habeas Petition

On October 14, 2020, Crawford filed his Petition that is now before the Court. (*See* Pet.) On October 15, 2020, this case was referred to me for a report and recommendation. (*See* Order of Ref., ECF No. 6.) On February 8, 2021, Respondent filed his papers in opposition to the Petition. (*See* Answer, ECF No. 13; Resp. Mem., ECF No. 13-1.) On April 9, 2021, Petitioner filed his reply. (*See* Reply, ECF No. 16.) Oral argument was held on June 3, 2021. (*See* 6/3/21 Oral Arg. Tr.)

## LEGAL STANDARDS

## I.   AEDPA Generally

Under 28 U.S.C. § 2254(a), a person in custody pursuant to a state court judgment only may prevail on an application for a writ of habeas corpus on the ground that his or her custody violates "the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A petitioner must show that the state court decision, having been adjudicated on the merits, is either "contrary to, or involved an unreasonable application of, clearly established Federal law" or is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). For the purposes of federal habeas review,

"clearly established Federal law" is defined as "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., concurring in part and concurring in judgment).

A state court decision is "contrary to," or an "unreasonable application of," clearly established law if it: (1) is contrary to Supreme Court precedent on a question of law; (2) arrives at a conclusion different than that reached by the Supreme Court on "materially indistinguishable facts"; or (3) identifies the correct governing legal rule but unreasonably applies it to the facts of the petitioner's case. *Williams*, 529 U.S. at 412-13. The state court decision must be "more than incorrect or erroneous;" it must be "objectively unreasonable." *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (citations omitted). The AEDPA "dictates a highly deferential standard for evaluating state-court rulings" and "demands that state-court decisions be given the benefit of the doubt." *Bell v. Cone*, 543 U.S. 447, 455 (2005) (internal quotation marks and citations omitted).

## II.   Sufficiency Of The Evidence

"The Due Process Clause prohibits conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which [the defendant] is charged.'" *Fashaw v. Griffin*, No. 17-CV-07328 (KPF), 2020 WL 6482924, at *13 (S.D.N.Y. Nov. 4, 2020) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)).  When considering insufficiency of the evidence claims on direct appeal, courts are required to consider the trial evidence in the light most favorable to the state and must deny relief if "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis and citations omitted); *see also Coleman v. Johnson*, 566 U.S. 650, 656

(2012) ("[T]he only question under *Jackson* is whether [the jury's verdict] was so insupportable as to fall below the threshold of bare rationality.").

Moreover, "where the state courts have decided a habeas petitioner's legal sufficiency claim on the merits, [ ] this Court must review that claim under a 'doubly deferential standard of review.'" *Fashaw*, 2020 WL 6482924, at *13 (quoting *Garbutt v. Conway*, 668 F.3d 79, 81-82 (2d Cir. 2012)). The petitioner's claim "face[s] a high bar," and the state court decision may only be overturned if it was "'objectively unreasonable.'" *Coleman*, 566 U.S. at 651 (quoting *Renico v. Lett*, 559 U.S. 766, 772 (2010)). Thus, where the state courts have denied a claim of insufficient evidence on the merits, the writ should not be granted unless "*no* reasonable court could have held that *any* reasonable jury could have read the evidence to establish petitioner's guilt beyond a reasonable doubt." *Garbutt*, 668 F.3d. at 82 (emphasis in original); *see also Scott v. Graham*, No. 16-CV-02372 (KPF) (JLC), 2017 WL 2820061, at *20 (S.D.N.Y. June 29, 2017), *report and recommendation adopted*, 2018 WL 5257613 (S.D.N.Y. Oct. 22, 2018) (petitioner challenging sufficiency of evidence to support state-court conviction "bears a very heavy burden").[11]

### DISCUSSION

Petitioner raises two arguments in support of his legal sufficiency claim: (1) that DNA evidence recovered from the stocking found at the crime scene—in the absence of any other incriminating evidence—was legally insufficient to prove guilt unless the prosecution also

---

[11] "Unlike a sufficiency of the evidence claim, which is based upon federal due process principles, a weight of the evidence claim is 'an error of state law, for which habeas review is not available.'" *Garret v. Perlman*, 438 F. Supp. 2d 467, 470 (S.D.N.Y. 2006) (citing *Douglas v. Portuondo*, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002)). Thus, to the extent that Petitioner suggests in his Memorandum of Law that he is challenging his conviction as against the weight of the evidence (*see* Pet. Mem. at 17), I recommend that any such claim be denied.

established that the DNA was deposited on the stocking during the commission of the crime; and

(2) that the evidence was insufficient because the jury had no rational basis to conclude that

Petitioner was any more likely to have committed the burglary than the man whose DNA also

was recovered from an incriminating location in the victim's apartment.[12] (*See* Pet. ¶¶ 19, 21;

Oral Arg. Tr. at 4-5.) The Court considers each of these arguments in turn.

I.      **The Appellate Division's Determination That The Stocking DNA Evidence Was Legally
        Sufficient Was Not Contrary To Or An Unreasonable Application Of Clearly Established
        Federal Law**

First, Petitioner contends that the Appellate Division's decision was "contrary to federal

movable forensic evidence law." (*See* Pet. Mem. at 13 (block capital letters omitted).) Petitioner

argues that "[u]nder federal law, where the prosecution seeks to prove a defendant's guilt solely

on the presence of his forensic material on an easily movable object, the prosecution must

establish that the forensic material could have been left only during the commission of the

crime." (Pet. Mem. at 13 (emphasis and footnote omitted).)

In support of his claim, Petitioner cites case law from the Fourth, Sixth, Ninth and District

of Columbia Circuits, case law from the District of Maryland and case law from New York state

courts to claim that the Appellate Division "applied a standard that differs dramatically from the

federal rule." (*See id.* at 13-17.) However, Petitioner does not identify any Supreme Court

---

[12] When considering the sufficiency of the evidence of a state conviction "[a] federal court must look to state law to determine the elements of the crime." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002). Under New York law, to establish Petitioner's guilt of Burglary in the Second Degree, the prosecution was required to prove that; Petitioner knowingly entered a dwelling (*i.e.*, the apartment), or remained unlawfully therein, "with intent to commit a crime therein." Penal Law § 140.25. Both of Petitioner's challenges relate to the identity of Petitioner as the person who entered Shanker's apartment. (*See* Pet. Mem. at 18.)

decision that establishes this federal law.[13] As Respondent correctly notes, "caselaw from lower federal courts is not 'clearly established Federal law, as determined by the Supreme Court of the United States,' 28 U.S.C. § 2254(d)(1), and a state prisoner may not seek federal habeas relief on the basis of the state courts' refusal to follow that caselaw." (*See* Resp. Mem. at 21-22 (citing *Glebe v. Frost*, 574 U.S. 21, 24 (2014).) Accordingly, Petitioner has not shown that the Appellate Division's decision regarding sufficiency of the stocking DNA evidence was contrary to clearly established federal law.

In his reply memorandum, Petitioner argues that the Appellate Division unreasonably applied the Supreme Court decision in *Jackson* in rejecting his legal sufficiency argument based on the stocking DNA evidence.[14] (*See* Reply at 4-7; *see also* 6/3/21 Oral Arg. Tr. at 10.) Petitioner cites to the same case law raised in his opening memorandum to argue that the Appellate Division's decision was unreasonable. (*See* Reply at 5-6.) However, as set forth in Legal Standards Section II, *supra*, to succeed on this claim, Petitioner would have to show that "no reasonable court could have held that any reasonable jury could have read the evidence to establish petitioner's guilt beyond a reasonable doubt." *Garbutt*, 668 F.3d at 82. Petitioner has not made such a showing.

---

[13] Only one of the cases cited by Petitioner was a habeas case, *see Mikes v. Borg*, 947 F.2d 353 (9th Cir. 1991), and *Mikes* predated the AEDPA. *See DeLeon v. McDonald*, No. 11-CV-02121 (EJD) (PR), 2013 WL 496349, at *6 (N.D. Cal. Feb. 7, 2013) ("Petitioner's reliance on *Mikes* is unavailing. *Mikes* is a pre-AEDPA case, and although it may be persuasive, it is not dispositive of this federal habeas petition.").

[14] In *Jackson*, the Supreme Court in affirming a reversal by the Court of Appeals of the grant of habeas relief by the District Court, held that, in the context of a sufficiency of the evidence challenge to a conviction: "A review of the record in the light most favorable to the prosecution convinces us that a rational factfinder could readily have found the petitioner guilty beyond a reasonable doubt of [the crime charged under state law]." *Jackson*, 443 U.S. at 324.

The Appellate Division relied upon two aspects of the record evidence in reaching its decision affirming the judgment of conviction. First, Petitioner's "DNA was on the stockings used by the burglar to tie up his victim, and . . . the only DNA found on the stockings came from [Petitioner] and the victim." *Crawford*, 173 A.D.3d at 484. Second, the Appellate Division held that, "the evidence supported the inference that the burglar took the stockings from the victim's drawer, even though the victim could not actually 'identify' the particular stockings." *Id*. The Appellate Division rejected what it described as Petitioner's "farfetched theory that he might have had contact with these stockings on some past occasion," as speculative, and cited analogous cases finding that fingerprint evidence, standing alone, could establish a defendant's guilt beyond a reasonable doubt notwithstanding speculation as to the origins of the prints. *See id*. (citing, *inter alia*, *Taylor v. Stainer*, 31 F.3d 907, 909-10 (9th Cir. 1994) (declining to extend *Mikes* "to cover fingerprints that are found in places or on objects that were never accessible to the general public and that can be explained in a manner consistent with innocence only through far-fetched, unsupported speculation."). Based upon this record evidence, it simply cannot be said that the Appellate Division's decision was objectively unreasonable such that no rational trier of fact could have found proof of guilt beyond a reasonable doubt.[15] *Accord Swinton v. Keane*, No. 89-CV-00933 (JSM), 1990 WL 134876, at *2-3 (S.D.N.Y. Sept. 13, 1990) (denying pre-

---

[15] To be sure, the juries that considered the evidence in this case had a difficult time in weighing the evidence. After all, in the first trial, a mistrial was declared given that jury's deadlock, and in the second trial, the jury initially was deadlocked as well. However, it is not the function of this Court to second-guess the second jury's verdict reached after due deliberation. *See Davis v. Farrell*, No. 07-CV-05920 (BSJ) (DFE), 2009 WL 3817401, at *1 (S.D.N.Y. Nov. 12, 2009) ("The role of a federal habeas court is not to conduct a second trial, or to second-guess the jury's assessment of the credibility of the trial witnesses.").

AEDPA habeas petition based on legal sufficiency where "jury could logically infer that petitioner

. . . handled the fingerprinted items only during the commission of the crime").

II.     **Petitioner's Remaining Challenge To The Sufficiency Of The Evidence Should Be Rejected**

Petitioner also argues that the Appellate Division misapplied *Jackson* because "no rational

juror could have found beyond a reasonable doubt that it was Mr. Crawford, rather than the

unknown Male Donor B, who was present in the apartment to commit the alleged crime." (Pet.

Mem. at 18.) However, as Respondent points out, this evidence was presented to the jury (*see*

Resp. Mem. at 23) and it was for the jury "to decide what conclusions should be drawn from

evidence admitted at trial." *Coleman*, 566 U.S. at 651. Moreover, "[t]he prosecution need not

disprove 'every possible hypothesis of innocence.'" *Bradley v. Burge*, No. 06-CV-00040 (JGK),

2007 WL 1225550, at *4 (S.D.N.Y. Apr. 19, 2007) (quoting *United States v. Roldan-Zapata*, 916

F.2d 795, 802 (2d Cir. 1990)). In light of the DNA evidence discussed above, it was not objectively

unreasonable for the Appellate Division to conclude that the jury's verdict was rational.

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the Petition be DENIED.

Dated:       June 14, 2021
             New York, New York

_____
STEWART D. AARON
United States Magistrate Judge

\*          \*          \*

**NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

The parties shall have fourteen (14) days (including weekends and holidays) from service

of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)

and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D) or (F)). A party may respond to another party's objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any response to objections, shall be filed with the Clerk of the Court. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Failla.

**FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.** *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985).